***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. On the date of injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between Employee-Plaintiff and Employer-Defendant on the date of injury.
3. The Employer-Defendant is self-insured.
4. The date of injury is January 11, 2008. On that date, Plaintiff was in a motor vehicle accident in which his vehicle was rear-ended by another vehicle.
5. The Employer-Defendant has admitted the compensability of and its liability for the accident on January 11, 2008 pursuant to a Form 60.
6. Plaintiff's average weekly wage at the time of the injury was $851.14, which yields a compensation rate of $567.46.
7. After the seven-day waiting period, Employer-Defendant initiated payment of temporary total disability compensation on or about January 23, 2008.
8. Employee-Plaintiff returned to work on January 24, 2008.
9. Employee-Plaintiff stopped working on or about March 3, 2008 and Employer-Defendant reinstated temporary total disability compensation pursuant to a Form 62.
10. Employee-Plaintiff remains out of work and is currently receiving ongoing temporary total disability compensation.
11. Employee-Plaintiff claims compensation for temporary total disability, temporary partial disability, permanent partial disability and medical treatment. *Page 3 
12. Employee-Plaintiff is still employed by Employer-Defendant.
 ***********
The Deputy Commissioner identified the following:
 ISSUES
1. Whether Plaintiff continues to be disabled as a result of his January 11, 2008 accident?
2. Whether Plaintiff has failed to comply with vocational rehabilitation after being ordered to comply by the Industrial Commission? If so, should Plaintiff's benefits otherwise be suspended?
3. To what extent has Plaintiff sustained any physical injuries due to the motor vehicle accident of January 11, 2008?
4. What, if any, additional compensation is Plaintiff entitled to receive?
5. Whether Defendant is entitled to a credit for compensation that was not due and payable when paid?
6. Whether Plaintiff should be sanctioned for failing to report wages to Defendant pursuant to two Industrial Commission Forms 90?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, Plaintiff was 54 years of age. Acting was his first career, beginning in his teenage years on Long Island. He *Page 4 
entered the social work field in 1999, has a master's degree in social work (MSW) from the University of North Carolina, and is a licensed clinical social worker (LCSW). Plaintiff began working for Defendant in 2002.
2. Plaintiff's prior medical history is significant for anisometropic amblyopia as a child, meaning that his right eye is weaker than his left eye. He also has bilateral astigmatism, greater on the right than the left. Plaintiff was diagnosed with bilateral herpes simplex keratitis infection in his eyes in approximately 1990. Under stressful conditions, the herpes keratitis flares up and causes blurred vision. Plaintiff complained of an eye convergence problem in April 2001 and that he had difficulty getting his eyes to work together in August 2006.
3. On January 11, 2008, Plaintiff was involved in a motor vehicle accident while on the way to a patient's home. His car was struck from the rear by another vehicle that the investigating police officer estimated to be traveling at 20 miles per hour. Plaintiff never saw the other vehicle before the accident and therefore could not have estimated the speed of the collision.
4. Plaintiff was wearing his seatbelt and the airbags did not deploy in either vehicle. Plaintiff experienced a whiplash where his head struck his headrest. Plaintiff did not lose consciousness, and it does not appear that he struck his face. The police report notes that both vehicles were drivable after the accident. Plaintiff reported that he was able to drive to a nearby parking lot immediately after the collision. Plaintiff telephoned his wife, but did not call 9-1-1.
5. Plaintiff was transported by Wake EMS to the emergency room of Duke Raleigh Hospital, where he was examined on the day of the accident. He was not diagnosed with a concussion. There was no indication in the initial ER report of any facial contusions or lacerations although a later report by a physician noted face and scalp contusions. Plaintiff *Page 5 
denied any double vision and his head was noted to be "atraumatic." Plaintiff's only complaints were neck pain and nausea. A cervical spine x-ray was normal. Plaintiff was diagnosed with a cervical strain and discharged home about two hours after arrival at the hospital.
6. Plaintiff presented to Dr. Michael Landolph at Duke Raleigh Hospital and Concentra Medical Center on January 14 and 15, 2008. Plaintiff complained of headache, blurred vision, nonspecific dizziness and head and neck pain, but did not complain of double vision. A CT scan of Plaintiff's brain and cervical spine was normal, except for a pre-existing arachnoid cyst. Dr. Landolph diagnosed a cervical strain and referred Plaintiff to a neurologist. Dr. Landolph released Plaintiff to return to work, but with no driving.
7. Plaintiff returned to see Dr. Landolph on January 29, at which time Dr. Landolph noted he was being seen for "re-evaluation of possible symptoms associated with whiplash." Plaintiff complained of vision problems and burning in his eyes, which both Plaintiff and Dr. Landolph ascribed to a flare-up of pre-existing herpes keratitis, activated by stress. Plaintiff specifically denied any double vision. Dr. Landolph referred Plaintiff to Dr. Durham, his optometrist whom he had previously seen for routine care.
8. As found in the original Opinion and Award in this case, the initial medical evidence showed indications that Plaintiff may have sustained injuries resulting in visual problems that could be related to the motor vehicle accident. Those findings of fact were based primarily upon the testimony rendered by Dr. Susan Durham who is a licensed optometrist, and not a medical doctor.
9. Additional evidence is now in the record and Plaintiff has been evaluated by many medical professionals, including at least three ophthalmologists, a neurologist, at least two orthopaedic specialists, two neuro-psychiatrists, and a psychologist, as well as his own *Page 6 
optometrist, Dr. Susan Durham. Plaintiff has also had many objective tests to try to determine whether he sustained any traumatic brain injury or damage to his visual function. As set out in these findings of fact, many of the medical professionals have been unable to find objective evidence to substantiate Plaintiff's subjective complaints.
10. In presenting to the medical professionals, Plaintiff often exaggerated his description of the motor vehicle accident, indicating speed at impact of 40 to 45 MPH; he has also exaggerated his symptoms. Plaintiff was not always candid about his complete medical history and pre-existing vision problems. Neither Dr. Saunders nor Dr. Subramanian had the benefit of Plaintiff's complete medical history when they examined him and, other than their own examinations, they relied upon the exaggerated complaints and somewhat incomplete history Plaintiff related.
11. When Plaintiff presented to Dr. Durham on January 29, 2008, he reported a 40-mile-per-hour collision — twice what was indicated on the police report. Dr. Durham diagnosed a moderate central corneal haze in both eyes contributing to Plaintiff's blurry vision. She testified and it is found that this was likely related to a flare up of his herpes keratitis caused by the stress of the accident, which cleared up within a few days.
12. Plaintiff complained of double vision for the first time on January 29, 2008. Dr. Durham initially diagnosed a probable superior oblique paresis, or a nerve problem preventing the muscle from moving like it should, causing diplopia, commonly referred to as double vision. A superior oblique paresis would be caused by a palsy of the fourth cranial nerve. Dr. Durham treated Plaintiff for several months based on this diagnosis, including vision therapy and prism lenses in multiple configurations. Dr. Durham assigned work restrictions prohibiting driving and limiting near point work. *Page 7 
13. A February 4, 2008 visual evoked potential (VEP) study was normal. A brainstem auditory evoked potential (BAEP) exam the same day was also normal. These tests demonstrated normal activity in the visual and auditory pathways in Plaintiff's brain and brainstem less than a month after the accident.
14. The neurologist and neuro-ophthalmologists who examined Plaintiff disagreed with the optometrist's diagnosis of a fourth cranial nerve palsy. Three ophthalmologists have found no evidence of nerve palsy. In weighing the testimony, the Full Commission gives greater weight to the opinions of the physicians than to the optometrist, based upon their training as medical specialists and their experience.
15. Dr. Timothy Saunders, who specializes in neuro-ophthalmology and pediatric ophthalmology, examined Plaintiff on October 21, 2008. Dr. Saunders could not confirm a fourth cranial nerve palsy.
16. Dr. Prem Subramanian of the Wilmer Eye Institute of Johns Hopkins University examined Plaintiff on August 7, 2009. Dr. Subramanian found no cranial nerve palsy and no muscle defects.
17. Dr. Edward Buckley of Duke University Medical Center examined Plaintiff on June 23, 2009. Dr. Buckley found no evidence of damage to the cranial nerves. Based upon the overwhelming competent and credible testimony of the physicians, it is found that Plaintiff has not sustained any damage to the muscles of his eyes or to any of the cranial nerves.
18. These ophthalmologists have all examined Plaintiff with regard to his complaints of double vision. Their methods have varied, and their interpretations of results have varied. Ultimately, two physicians are like-minded in their assessments, based upon the results of their testing. *Page 8 
19. Dr. Subramanian and Dr. Saunders have both concluded and it is found that Plaintiff has a very small deviation, an intermittent hypertropia. Dr. Saunders used the term "phoria" while Dr. Subramanian referred to it as "tropia." This deviation occurs when the eyes are misaligned and the patient has problems with fusion of an image, and double vision may occur. The Plaintiff's deviation is so small that it is difficult to measure or detect.
20. The neuro-ophthalmologists disagreed about whether the intermittent ½ to 1 diopter vertical deviation was a "phoria" or a "tropia," but agreed that a very small phoria can be difficult to differentiate from a very small tropia and ultimately it would not matter. The neuro-ophthalmologists also agreed that Plaintiff's intermittent ½ to 1 diopter vertical deviation was an amount of deviation that many or even most people would not notice. However, for some patients, even a small deviation can result in diplopia, i.e. double vision.
21. In his examination of Plaintiff, Dr. Buckley found no evidence of misalignment of the eyes. He found nothing to explain Plaintiff's complaints of double vision and disagreed with Dr. Subramanian's assessment. Dr. Buckley concluded that Plaintiff did not need further vision care as a result of the accident; and that Plaintiff should not have any work restrictions or driving restrictions related to his vision.
22. Although the Full Commission has given slightly more weight to the testimony of Dr. Saunders and Dr. Subramanian, who made objective findings, both of these ophthalmologists acknowledge that the problem they identified is very small, and difficult to detect or measure. They also acknowledge that other than this small deviation, they can find no objective evidence to support Plaintiff's ongoing subjective complaints of double vision.
23. Dr. Subramanian stated "I was not able to pinpoint a specific abnormality that could explain his diplopia. But I felt that based on his history, there was reason to understand *Page 9 
why his objective findings, his tendency towards vertical deviation, would lead to his diplopia." Dr. Saunders likewise confirmed that other than the small right hyper deviation, he found no physiologic cause of the Plaintiff's diplopia. Dr. Saunders also acknowledged that Plaintiff's description of the diplopic symptoms might be out of proportion to the objective findings that he was able to measure and observe.
24. Based upon these observations by Dr. Subramanian and Dr. Saunders, and the testimony of Dr. Buckley, which is also found to be credible and competent, although it is found that there is a small objective basis for assessing Plaintiff with double vision, Plaintiff's subjective complaints are also exaggerated and out of proportion with objective findings. To the extent that some of the measurements and tests used by the physicians are based upon subjective reporting by Plaintiff, the results are not deemed to be completely reliable.
25. As part of the testing, Plaintiff was administered the Titmus test or stereopsis, to measure depth perception, and the ability to coordinate the two eyes together. Plaintiff demonstrated normal fusion and stereopsis when tested by Dr. Buckley as well as the other neuro-ophthalmologists who examined him. Plaintiff demonstrated better stereopsis for Dr. Saunders and Dr. Subramanian than he did for Dr. Buckley. Dr. Buckley measured 100 arc seconds of fusion, within a normal range. Dr. Saunders measured 80 arc seconds, which is a better result, and Dr. Subramanian measured 60 arc seconds of fusion, which is better yet.
26. Because of Plaintiff's complaints of double vision, Dr. Buckley did not expect Plaintiff to be able to coordinate at all, but noted that he did this "quite easily." Dr. Saunders found the results of such testing better than he expected. Dr. Subramanian could have tested Plaintiff's fusion at a distance with the resources available in the Wilmer Eye Center, but elected not to perform that test. *Page 10 
27. Even Dr. Durham could not say with any certainty that Plaintiff has diplopia. Her testimony was that Plaintiff could see two images in the distance, but not all the time, and that "if [his vision] is ever truly double, it's only in the distance." She described Plaintiff's current vision problem as more of a "smear" or "blur."
28. The ophthalmologists have assessed Plaintiff's diplopia as related to a concussion sustained in the motor vehicle accident. Plaintiff failed to lose consciousness in the accident. The evidence fails to show any objective evidence of a brain injury, as shown by MRI and CT scans. The only evidence of "concussion" is the opinion testimony of these physicians. While the same is deemed credible, it is also somewhat speculative, and based on Plaintiff's subjective complaints. The greater weight of the credible evidence shows that any such "concussion" was mild, and resulted in no objectively measurable brain injury.
29. Plaintiff has been difficult to assess or treat for his complaints of double vision. Both Dr. Durham and Dr. Saunders spent extensive amounts of time trying different combinations of prisms to treat Plaintiff's diplopia. Whatever combination of lenses they tried, Plaintiff reported that he was not happy with the results. Dr. Saunders could not conclusively diagnose, measure, or treat Plaintiff's subjective vision symptoms and believed he would not be able to satisfy Plaintiff.
30. Dr. Buckley did not restrict Plaintiff from driving. Dr. Saunders would prefer that Plaintiff not drive. However, he also believed that Plaintiff's double vision complaints should be correctible with the right prism. With proper vision correction, either through prism correction and/or patching one eye, and driving training, Plaintiff should be able to resume driving a vehicle. To date, Plaintiff has not shown interest in following through with such treatment or with driving training. *Page 11 
31. Neurotologist Dr. Adunka (an ear specialist within the field of otolaryngology) and vestibular rehabilitation therapist Dr. Clendaniel ruled out any possibility of vestibular hypofunction (loss of function). Plaintiff's persistent complaints were inconsistent with the normal objective test results. Dr. Clendaniel did not see any evidence of a concussion injury or any appearance of mental or psychological effects from concussion. He concluded that Plaintiff's symptoms did not correlate to the physical findings and released him from care with no restrictions from a vestibular standpoint. Dr. Adunka agreed with that assessment and concluded that Plaintiff did not require further neurotologic follow up. Dr. Adunka had doubts about the validity of Plaintiff's subjective complaints.
32. Plaintiff was examined by two neuropsychiatrists. Dr. Thomas Gualtieri found no signs of a significant traumatic brain injury. He noted that Plaintiff had presented an inconsistent clinical picture with negative or inconsistent objective test results for more than a year since the accident. Dr. Gualtieri diagnosed post concussion syndrome in a patient predisposed to anxiety with a personality characterized by histrionic traits. He recommended a short course of behavioral therapy (6 visits over 12 weeks) to reduce anxiety followed by a return to work as soon as possible, and referred Plaintiff to psychologist Dr. Elizabeth Van Horn.
33. Plaintiff presented for therapy with Dr. Van Horn, who diagnosed him with an adjustment disorder with anxiety. Dr. Van Horn agreed that Plaintiff exhibited some histrionic traits, but found he did not meet the criteria for a histrionic personality disorder. Dr. Van Horn treated Plaintiff for his anxiety symptoms and he showed consistent improvement. By March 30, 2009, Plaintiff's anxiety had resolved. As of that date, Dr. Van Horn determined that Plaintiff was coping well with his adjustment disorder and that there was no psychological basis to restrict him from returning to work. *Page 12 
34. Plaintiff underwent an independent medical examination by neuropsychiatrist Dr. Manish Fozdar on June 15, 2009. Dr. Fozdar is an expert in the fields of general psychiatry, neuropsychiatry, psychosomatic medicine, and behavioral neurology. Psychosomatic medicine is the interface between medicine and psychiatry dealing with the interactions between a patient's medical and psychological state. Neuropsychiatry is the subspecialty of psychiatry that deals with neurobehavioral and neurocognitive issues in patients with a brain disorder, including patients with traumatic brain injury.
35. Dr. Fozdar reviewed Plaintiff's complete medical history, noting that the two images of Plaintiff's brain, the MRI and CT scan were normal. Dr. Fozdar performed a neurological examination as well as a bedside cognitive evaluation. He opined that Plaintiff did not sustain any significant traumatic brain injury and did not have any cognitive defects as a result of the motor vehicle accident. Dr. Fozdar found that Plaintiff was exaggerating his symptoms, consistent with the histrionic traits identified by Dr. Gualtieri and Dr. Van Horn.
36. Dr. Fozdar concluded that Plaintiff was also exaggerating the disability from his reported symptoms. Dr. Fozdar noted that Plaintiff had been through many medical examinations, without objective findings to support many of his subjective complaints. Dr. Fozdar concluded that Plaintiff has a personality disorder. Dr. Fozdar found that Plaintiff was capable of performing the duties of a clinical social worker as outlined in the Duke University Health System Job Description, the job he was performing, and for which he is qualified.
37. Neurologist Dr. Jagadeesan examined Plaintiff and found his cranial nerves were normal. Dr. Jagadeesan could not find any medical explanation for Plaintiff's "subjective diplopia in all directions," nor his alleged positional and non-positional vertigo. Plaintiff did not have any nystagmus, or the rapid eye movements associated with vertigo. Diplopia in all *Page 13 
directions, as Plaintiff reported, is unusual and suggests a nonorganic cause. Dr. Jagadeesan ruled out any cervical spine injury or weakness from trauma.
38. Plaintiff was evaluated by physiatrist Dr. Tawney and neurosurgeon Dr. Lestini for neck pain and left heel pain. A January 2008 CT scan revealed chronic degenerative cervical disc disease unrelated to the accident. Dr. Tawney diagnosed a neck strain. By July 16, 2008, Plaintiff had full range of motion and he released Plaintiff with no work restrictions related to the neck. On July 30, 2008, Plaintiff reported virtually no neck pain to Dr. Lestini, but complained of left heel pain. Dr. Lestini agreed that there was no cervical basis for Plaintiff's complaint of dizziness. The left heel pain was unrelated to the accident. Dr. Lestini released Plaintiff from care with no restrictions from a cervical spine standpoint.
39. None of the treating or examining physicians continues to keep Plaintiff out of work. At least two physicians and Dr. Van Horn have specifically released Plaintiff to return to work without restrictions. The only evidence of any residual effect of the accident is Plaintiff's double vision, for which symptoms are found to be exaggerated, and for which treatment is available.
40. Prior to the accident, Plaintiff had been cast in the role of "Pawnee Bill" in the North Carolina Theatre production of "Annie Get Your Gun." His contract for that show included rehearsals and performances from February 11 through March 2, 2008. He was paid $1,827.00 for his work. Plaintiff failed to disclose these wages on his August 12, 2008 Industrial Commission Form 90. Plaintiff completed all performances without any special accommodations. No one observed Plaintiff having any problems with vertigo, nausea, or dizziness. *Page 14 
41. The day after Annie Get Your Gun closed, Plaintiff asked to be taken out of work due to complaints of vertigo, nausea, or dizziness. His temporary total disability benefits were reinstated on March 3, 2008. He has not returned to work for Defendant thereafter, but has continued his acting work.
42. Prior to the accident, acting was only a hobby for Plaintiff while he worked full-time for Defendant. During the period that Plaintiff has received temporary total disability (TTD) benefits, he has pursued acting as his primary career, and that is now his focus.
43. In March 2008, Plaintiff auditioned for a movie role in Raleigh and he continued to audition for other local movie and stage roles. He worked in some local acting roles for which he did not have to audition. In addition, during the period from March 2008 to August 2009, Plaintiff made ten trips to New York to audition for acting roles on Broadway in major shows including "Wicked," "Spiderman," and "Jersey Boys." In the year prior to the accident, Plaintiff made only two trips to New York. Plaintiff admitted that he would not have been able to make so many trips if he had been working full-time.
44. Plaintiff played "Captain Hook" in the Marbles Children's Museum production of "Peter Pan" in three shows per day on four consecutive Saturdays beginning June 7, 2008. Plaintiff was paid $300.00 wages, which he disclosed on his August 12, 2008 Industrial Commission Form 90.
45. Plaintiff also played "Saul" in the Hot Summer Nights at the Kennedy Theater production of "True West," that ran from June 23 to July 13, 2008, for which he was paid $1,200.00. Plaintiff failed to disclose these wages on the August 12, 2008 Form 90 or on the August 3, 2009 Form 90. Plaintiff's testimony that he forgot to disclose these wages on the *Page 15 
Form 90 just one month after he earned them was not credible. The Full Commission finds that Plaintiff willfully did not disclose these wages.
46. In December 2008, Plaintiff had a role as an extra in a commercial for the TSA, for which he was paid $128.00. Those wages were also not disclosed on the August 3, 2009 Form 90.
47. In July 2009, Plaintiff performed as "Max" in the North Carolina Theatre production of "The Sound of Music." This was the most important role he had ever played for North Carolina Theatre. Because Max was a principal role in the play, tending toward a lead role, Plaintiff's contract and rehearsal schedule required him to work on a full-time basis, up to 42 hours per week, for three consecutive weeks. Plaintiff's rehearsal schedule for this role would have directly conflicted with his work schedule as a hospice social worker for Defendant. Plaintiff earned $2,100.00 plus gas reimbursement for his work.
48. In the role of Max, Plaintiff performed physical activities that were inconsistent with his alleged vertigo and double vision, including spinning around while blindfolded in a children's game and jumping up and down from a bench while singing and dancing. No one observed Plaintiff display any symptoms of his alleged conditions.
49. When Plaintiff's acting career conflicted with medical treatment, his first priority was acting. Plaintiff did not schedule any late afternoon medical appointments, yet he was always available for evening rehearsals and performances. Plaintiff cancelled a vision therapy and a doctor appointment on October 30, 2008 when they conflicted with a Broadway audition. His credibility was diminished when he informed the case manager that he had missed the appointments because of a "family emergency," when in fact he was in New York in furtherance of his acting career. *Page 16 
50. In addition to his ongoing work as an actor, Plaintiff has maintained other activities of daily living without evidence of impairment, including driving and working on a riding lawn tractor. On May 5, 2008, Plaintiff was observed driving a lawn tractor around numerous obstacles in a yard for nearly an hour without apparent difficulty, which contradicts his statements to the driving evaluator that he sees two of everything, including lines on the road. He could not have navigated the lawn tractor successfully if he saw double images of trees and obstacles in the yard. Also on that day, Plaintiff spent periods of time as long as 12 to 15 minutes performing "near" work on the lawn mower engine, behavior inconsistent with his complaints of visual problems, particularly as assessed by Dr. Durham.
51. Plaintiff participated in exercise classes at a local gym. As observed in February 2009, Plaintiff exhibited no obvious problems with balance, vertigo, or motion-induced nausea in exercise classes. Although there is testimony from lay witness Eric Gossick that on one or two occasions in later classes, Plaintiff stopped to rest, that testimony fails to establish that it was due to dizziness. Plaintiff never lost his balance or fell due to dizziness, and that testimony is not persuasive.
52. On or about April 27, 2009, Defendant assigned this claim to qualified rehabilitation professional (QRP) Ron Alford, M.Ed., CRC to determine whether vocational rehabilitation would benefit Plaintiff. On May 26, 2009, Plaintiff's counsel announced that Plaintiff would not voluntarily cooperate with vocational rehabilitation and specifically would not meet with the QRP for an initial vocational assessment. Plaintiff later agreed to meet with the QRP after a motion had been filed with the Industrial Commission to compel his cooperation. *Page 17 
53. Mr. Alford attempted to provide vocational rehabilitation consistent with the work restrictions assigned by optometrist Dr. Durham. Defendant purchased a computer with voice-activated software to accommodate the near point work restriction.
54. Plaintiff engaged in a pattern and practice of noncompliance with vocational rehabilitation. Plaintiff delayed cooperation with the software training and then exaggerated his limitations so that the training was unsuccessful.
55. Plaintiff did not apply for transportation assistance as directed by the QRP for almost three months from June to August 2009.
56. Plaintiff refused to apply for suitable employment opportunities identified by the QRP. The QRP took Plaintiff's personal preferences into account together with other suitable employment factors. In view of his education, experience, and licensure, Plaintiff would be qualified for a broad range of social work jobs and should be able to adapt to the particular requirements of many jobs. Plaintiff substituted his personal judgment for that of the QRP and declined to apply for jobs based on his personal preferences. Despite repeated requests from QRP Alford, Plaintiff never provided him any evidence of his purported independent job search.
57. Plaintiff could eliminate any double vision by covering or closing one eye, or by using a spot patch on one eye. Plaintiff previously told driving driving evaluator Faye Tripp that his double vision persisted even with one eye closed. However, when pressed, Plaintiff admitted in his hearing testimony that he has no double vision with one eye closed or covered. Early in her treatment, Dr. Durham prescribed a spot patch to eliminate the double vision and improve function, which Plaintiff refused to use.
58. Plaintiff could benefit from specialized driver training to learn to drive safely and legally using only one eye. QRP Alford identified a certified driving instructor to provide *Page 18 
training, but Plaintiff refused to participate. It is legal for a person with vision in only one eye to drive in North Carolina and there are techniques that can be taught for safe driving. The driving instructor could have offered Plaintiff techniques to drive safely with one eye covered.
59. Plaintiff's activities refute the alleged limitations that form the basis of the work restrictions assigned by Dr. Durham. At Plaintiff's invitation, she saw The Sound of Music, but did not recall Plaintiff jumping on the bench or spinning around while blindfolded. She had not seen the surveillance video of Plaintiff driving the lawn tractor or exercising. Her testimony that Plaintiff's activities were not inconsistent with his restrictions was made without knowing the full extent of his activities.
60. Plaintiff does not need to have a near point work limitation, and Dr. Durham's testimony to the contrary is rejected as not supported by the greater weight of the evidence. Plaintiff has demonstrated behaviors inconsistent with this restriction. As an actor, Plaintiff was able to read and learn his scripts. Plaintiff admitted that he read the script for The Sound of Music into his voice recorder at one sitting.
61. Plaintiff's prior complaints of motion-induced nausea, dizziness, and vertigo have resolved. Plaintiff had previously complained that riding more than 30 minutes in a car to medical appointments made him nauseous to the point of vomiting and sometimes incapacitated him for days. However, Plaintiff rode approximately 40 minutes each way to and from rehearsal for two weeks during The Sound of Music. He was never observed to be sick after arriving at rehearsal and was always ready to begin work. Plaintiff made ten airplane trips to New York, as well as transfers in North Carolina and New York, and was never too sick to audition.
 *********** *Page 19 
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: CONCLUSIONS OF LAW
1. Although this is an accepted case where Plaintiff is receiving ongoing benefits, the greater weight of the competent and credible evidence demonstrates that Plaintiff is no longer "disabled" within the meaning of the Workers' Compensation Act. As shown by the competent medical opinion, Plaintiff is capable of returning to work in his prior capacity as a social worker. By March 30, 2009, Plaintiff had been released to return to work from a physical and psychological perspective, and ongoing total disability benefits beyond that date should not be authorized. N.C. Gen. Stat. § 97-29; Watson v. Winston-SalemTransit Authority, 92 N.C. App. 473, 374 S.E.2d 483 (1988);Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001).
2. In the January 23, 2009 Opinion and Award, the Deputy Commissioner ordered Plaintiff to comply with medical and rehabilitation appointments. Vocational rehabilitation is a component of medical compensation. Collins v. Speedway MotorSports Corp., 165 N.C. App. 113, 121, 598 S.E.2d 185, 191 (2004). Vocational rehabilitation services intended to lessen the period of disability are provided to an injured employee pursuant to N.C. Gen. Stat. §§ 97-25 and 97-2(19). Foster v. U.S. Airways,Inc., 149 N.C. App. 913, 563 S.E.2d 235 (2002).
3. Plaintiff has failed to cooperate with reasonable vocational rehabilitation offered by Defendants, as ordered by the Deputy Commissioner. Plaintiff does not have the discretion to refuse to pursue suitable employment because it is not compatible with his personal preferences. Suitable employment is "any job that a claimant is capable of performing considering his age, education, physical limitations, vocational skills and experience." Shah v.Howard Johnson, *Page 20 140 N.C.App. 58, 68, 535 S.E.2d 577, 583 (2000). QRP Alford provided Plaintiff with several suitable positions in accordance with Rule III.G of the Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims. Plaintiff did not apply for the positions. Plaintiff also failed to cooperate with the driver training aspect of vocational rehabilitation. Where Plaintiff has failed to cooperate with vocational rehabilitation, benefits may be suspended pursuant to N.C. Gen. Stat. § 97-32.
4. As shown by competent and credible medical opinion, Plaintiff has sustained at most a mild concussion from the motor vehicle accident from which the only residual effect is the Plaintiff's double vision, which is found to be legitimate, but exaggerated. Defendants are responsible for ongoing medical treatment of the same. The evidence fails to establish that Plaintiff sustained any injury to his cranial nerves or muscles about his face, which have impaired his vision. N.C. Gen. Stat. §§ 97-2(19), 97-25.Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003).
5. Where Plaintiff has regained his capacity to earn wages, and has refused to cooperate with vocational rehabilitation, and has refused to attempt to return to suitable employment, Plaintiff's ongoing total disability benefits should be suspended, as of July 6, 2009, when Defendants renewed the Motion to Suspend Compensation. Plaintiff's noncompliance with vocational rehabilitation has impermissibly extended his period of temporary total disability, and the compensation benefits paid for total disability. The Commission has discretion to award a credit to Defendants for total disability payments (TTD) made to Plaintiff during the period of Plaintiff's non-compliance with vocational rehabilitation, as the same were not due and payable when paid. N.C. Gen. Stat. §§ 97-32, 97-42. *Page 21 
6. Plaintiff's willful failure to disclose wages on the August 12, 2008 Industrial Commission Form 90, in violation of Rule 903 of the Workers' Compensation Rules of the North Carolina Industrial Commission, subjects Plaintiff to possible sanctions pursuant to Rule 802 of the Workers' Compensation Rules of the Commission.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's ongoing temporary total disability (TTD) compensation is hereby Suspended. Defendants may immediately cease payment of such benefits.
2. Defendant is awarded a credit for all weeks of temporary total disability benefits paid to Plaintiff since the filing of the Motion to suspend benefits on July 6, 2009, to be deducted from future compensation otherwise payable in this claim, if any, on a week-for-week basis.
3. In the discretion of the Full Commission, further sanctions are not imposed.
4. Defendants are responsible for any further reasonably necessary medical treatment for Plaintiff's diplopia (double vision) and may direct such medical care.
5. Defendants shall pay the costs, including all expert witness fees if not paid by prior Order.
This ___ day of April 2011.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 22 
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1